[Civ. No. 1809.   Third Appellate District.—June 27, 1918.]

S. M. SPURRIER et al., Appellants, v. W. C. NEUMILLER, as County Treasurer, etc., Respondent.

RECLAMATION DISTRICT—ENTRY OF CREDIT ON ASSESSMENT—MANDAMUS—ESSENTIALS.—To entitle land owners to *mandamus* to compel entry of a credit on a reclamation district assessment declared invalid after payment of the assessment, it is incumbent upon them to show that they are injured by failure to so credit their land.

ID.—ADVANTAGE OVER OTHER LAND OWNERS—MANDAMUS.—*Mandamus* will not lie at the instance of land owners to compel the entry of a credit on an invalid assessment, where it appears that, if the writ were granted, they would gain an advantage over other land owners

who have already been charged with an excess amount to equalize the burden.

ID.—INTEREST ON PAYMENTS—INSUFFICIENT GROUND FOR WRIT.—Where land owners have been given credit on an invalid reclamation district assessment, and they did not demand or claim interest, they are not entitled to the writ because interest was disregarded.

ID.—LAND OWNERS, WHEN NOT ENTITLED TO CREDIT.—Section 3466½ of the Political Code, in its original form, does not entitle land owners to reimbursement where the payments were made by former owners, and no showing is made that they expended anything therefor or incurred liability in consequence thereof.

ID.—CHANGE OF POLICY OF REASSESSMENTS — CODE AMENDMENT — CONSTITUTIONAL LAW.—The legislature in amending section 3466½ of the Political Code (Stats. 1911, p. 647) changed the policy of levying reassessments in reclamation districts, but did not thereby deprive any land owners of any contractual right, and the application of such amended section is not violative of section 10, article I, of the federal constitution, or of section 16, article I, of the state constitution.

APPEAL from a judgment of the Superior Court of San Joaquin County. J. A. Plummer, Judge.

The facts are stated in the opinion of the court.

D. V. Marceau, John A. Wilson, and S. M. Spurrier, for Appellants.

Clary & Louttit, and Gerald Beatty Wallace, for Respondent.

BURNETT, J.—The controversy herein arises by reason of two assessments levied by Reclamation District No. 17 in the county of San Joaquin. The first one, which we will denominate the "Bonbini assessment," was based upon a petition filed with the board of supervisors of said county on the second day of April, 1907, Charles and George Dangers being then the owners of the lands herein involved. The property was charged with an assessment of $3,270.63, against which a credit of $900.18 was allowed in consequence of a former assessment, and the balance with interest was finally paid on March 3, 1909. On May 9, 1911, by judgment entered in the superior court of said county, the Bonbini assessment was decreed to be invalid. Seven land owners within the district did not pay the Bonbini assessment.

The other, which we may call the Spurrier assessment, was based upon a petition filed on the sixteenth day of October, 1911. In apportioning this assessment, the commissioners equalized the inequalities caused by the payment by some and the failure of payment by others of said invalid assessment. As to this the court found: ''The said commissioners did charge and assess against the said respective parcels of land situated in said district, against which the said prior assessment had been declared by a court of competent jurisdiction to be invalid, and which said assessment remained unpaid, with such proportion of the former invalid assessment as the benefits derived by the said respective parcels of land from the reclamation works for which said former assessment was levied bore to the whole amount of said former invalid assessment, and the said charges and assessment so fixed and levied by said commissioners against said respective parcels of land, did charge the said last-named parcels of land, and each of the other tracts of land within the said district with its proper proportion of the costs of the reclamation of the lands therein; . . . that the land of plaintiffs has not paid and it has not been charged with more than its proper proportion of the costs of reclamation.''

It is not contended that this finding is unsupported. Indeed, it was stipulated at the trial ''that the commissioners in levying and charging the lands in said Reclamation District No. 17 in 1911 did charge and assess against the respective parcels of land situated in said district, and which said parcels of land did not pay the former invalid assessment, with such proportion of such former assessment as the benefits derived by said respective parcels of land from the reclamation works for which said former invalid assessment was levied bore to the whole amount of said former invalid assessment.''

Notwithstanding the foregoing stipulation and finding, it is the contention of appellants that the county treasurer of said county should be compelled to enter a credit of the amount paid by said Charles and George Dangers on the Bonbini assessment to be applied *pro tanto* to the payment of the Spurrier assessment. The basis for the claim is found in the following language of section 3466½ of the Political Code as it formerly existed:

"In all cases in which an assessment shall have been levied since October first, eighteen hundred and ninety-six, or shall hereafter be levied, for reclamation purposes, upon the lands embraced within any reclamation district, and the assessment shall have thereafter been or shall be adjudged invalid, by any court of competent jurisdiction, and any land owner of the district shall have paid the amount assessed, in said assessment, against land belonging to him, before said assessment shall have been or shall be so adjudged invalid, the amount so paid by said land owner, together with the legal interest thereon from the date of its payment, shall be credited, by the treasurer of the county in which said land is situated, to the tract of land on which the same was paid, and shall be applied upon any assessment thereafter levied on the lands of the district, to the payment, *pro tanto,* of the amount therein assessed against said tract of land."

In explanation of the course pursued in equalizing said assessment it is proper to say that by an amendment taking effect April 5, 1911, [Stats. 1911, p. 647], and prior to said Spurrier assessment, the said section 3466½ was made to read as follows: "In all cases in which an assessment shall have been levied or shall hereafter be levied, for reclamation purposes upon the lands embraced within any reclamation district, and if the assessment upon any tract or tracts of land shall have thereafter been adjudged invalid by any court of competent jurisdiction, or if, for any reason, any tract or tracts of land shall not have been charged with said assessment, then such tract or tracts of land shall be charged in any subsequent assessment with such proportion of the former assessment, as the benefits derived by said land from the reclamation works for which said former assessment was levied bears to the whole amount of said former assessment; or a subsequent reassessment of such tract or tracts of land made be made separately for the purpose of charging said land with its proper proportion of the costs of reclamation." In this connection we may state that the validity of this Spurrier assessment under said section as amended was upheld by the supreme court on an appeal taken by these same appellants in the case of *Spurrier* v. *Reclamation District No. 17,* 172 Cal. 157, [155 Pac. 840]. In the leading opinion filed in said cause it is declared that "the legal effect of the amendment was, of course, to repeal the portion of the section, which had

been omitted and leave the rights of those owners who had paid an assessment adjudged invalid unaffected by any express statutory provision as regards the obtaining of credit for such payment.''

This language would seem to imply that there is no longer any statutory authority for allowing credit for the payment of the invalid assessment. It is fair though to say that the supreme court in another portion of the opinion specifically disclaimed the purpose of determining in that decision whether the appellants were entitled to credit for said payment, and in the concurring opinion of Mr. Justice Shaw it was suggested that ''if the parties who paid the assessment have any remedy for the interest afterward accruing thereon, it must be sought by some other mode than by including it in a reassessment upon the delinquent lands under the section as amended in 1911.''

But assuming that said section 3466½ in its original form created a vested right to a credit in favor of appellants, which could not be impaired or destroyed by a subsequent amendment to the law, it is entirely apparent that said appellants were not entitled to the mandate as applied for. This follows from the said stipulation and finding that there was an equalization of the inequalities which arose from the Bonbini assessment. In other words, those who did not pay said assessment were required by the Spurrier assessment to pay their proportion of the former assessment as well as of the latter. Thus, in effect, were appellants given credit for their payment of the Bonbini assessment except the interest, as the others were compelled to make a similar payment. In other words, the situation was rendered practically the same as though all the land owners had paid their full proportion of the invalid assessment. In such condition, how would credit be given? Suppose there were four land owners all together, and an invalid assessment of one hundred thousand dollars had been levied and paid by them, twenty-five thousand dollars each, and it was necessary to raise another hundred thousand dollars by assessment. The money could not be raised by crediting the land with the payment of the in-. valid assessment. If it were desired to give each parcel of land specific credit for the payment of the invalid assessment, it would be necessary to petition for an assessment of

two hundred thousand dollars, in order that after full credit had been given there might be available one hundred thousand dollars to apply to the purposes of the second assessment. But it is obvious that no more would be required of each land owner if the assessment were for one hundred thousand dollars and he be required to pay his proportion. The nonpaying land owners in the case at bar having been required to make good their delinquency on the invalid assessment, we have a similar situation to one wherein all the land owners have paid the invalid assessment.

Of course, to entitle them to the writ, it was incumbent upon appellants to show that they were injured by the failure to credit the land with said payments. To the contrary the finding is that the inequalities were adjusted and that appellants were charged with no more than their just proportion of the cost of reclamation.

It also appears that if the writ were granted, appellants would gain an advantage over other land owners who have already been charged with an excess amount to equalize the burden. "*Mandamus* will not lie where its effect would be inequitable or unjust as to third persons or will introduce confusion or will not promote substantial justice." (*Board of Education* v. *San Diego*, 128 Cal. 369, [60 Pac. 976].)

At any rate, appellants, in effect, have been given credit for the principal of their payments, and the only consideration of which they could complain is that interest on said payments was not regarded in equalizing said assessments, and this was probably the consideration that Judge Shaw had in view in making the suggestion hereinbefore quoted. But they made no such demand on the treasurer nor is there any intimation in this proceeding that they desire such credit. They claim that they are entitled to credit for *principal* and *interest* and upon that claim they have elected to stand or fall.

There is another view which, in my opinion, although not argued by counsel, is fatal to the claim of plaintiffs. While the language of the original section is that payment shall be credited "to the tract of land on which the same was paid," yet it is true as declared by the supreme court in *Reclamation District* v. *Bonbini*, 158 Cal. 206, [110 Pac. 580], that "the whole object and scheme of section 3466½ of the Political Code was to provide for reimbursement of those who may

have paid the amounts assessed against their lands where such lands were not liable therefor because of the invalidity of the assessment against them.''

Plaintiffs herein did not pay said assessment, and hence the occasion does not call for reimbursement. It was paid, as we have seen, by the former owners of the property, and there is nothing to show that appellants expended a dollar therefor, or incurred any liability in consequence of it. It does not appear that the land cost them any more than if said assessment had not been paid by the Dangers brothers, or that said circumstance entered at all into the consideration for said purchase. In other words, we must assume that the plaintiffs are in exactly the same situation financially as though said payment had not been made by the former owners. In that view of the case, it would appear plain that no injury to plaintiffs has been shown.

Moreover, we think the said section 3466½, as amended, is the law applicable to the case, and that it cannot be said that there has been a destruction or impairment of any vested right.

Appellants call attention to the fact that several sections of the Political Code were amended at the same time as said section 3466½ in 1911, among them being section 3478 of said code. The last made said amendment applicable to all reclamation districts, with three exceptions or provisions, as follows: 1. ''Any proceeding which shall have been already commenced for the levy or collection of assessments in such district when this section takes effect.'' 2. ''Any act done or performed in relation to the affairs of such district prior to such last mentioned date.'' And 3. It shall not affect ''the indebtedness of such district theretofore incurred excepting as to the method of liquidating such indebtedness.'' Only by virtue of these provisions could it be said, if at all, that the amended section does not control said Spurrier assessment. But without a specific analysis of these provisions it is sufficient to say that said assessment involved ''the method of liquidating the indebtedness of the district,'' and, therefore, the amended statute is expressly declared to be applicable to such a case.

The inquiry as to whether there was in plaintiffs, or the former owners of the land, any vested right to said credit

leads to the consideration, as suggested by respondent, of the nature of a reclamation district, the character of the obligation created by assessments, and the relation between the district and the land owner as to the assessment and its payment.

These districts are undoubtedly "governmental agencies to carry out a specific purpose." (*Reclamation District No. 7* v. *Sherman,* 11 Cal. App. 407, [105 Pac. 277].) And the local assessment levied in return for the benefits conferred upon the property assessed by the improvements for which the assessment is levied is a species of tax. (Cooley on Taxation, p. 416.) It is true that the method of apportionment in the local proceedings is different from that involved in the general burdens imposed by taxation for state and municipal purposes, but in each case the assessment is an exercise of the taxing power.

Taxes are not debts, nor founded upon contract, but they are charges upon persons or property to raise money for public purposes. (*Perry* v. *Washburn,* 20 Cal. 318.)

A swamp-land assessment is a charge imposed upon property by authority of the legislature, and the fact that it is only a lien upon the property assessed and not a direct charge against the owner is immaterial. (*People* v. *Hulbert,* 71, Cal. 72, [12 Pac. 43].)

The levy of a street assessment is based upon the governmental power of taxation. (*Hornung* v. *McCarthy,* 126 Cal. 17, [58 Pac. 303].)

The legislature must originate the power to tax and prescribe the rules under which taxes are to be levied, but the determination of the amount, even of a state tax, may be referred to some other authority. The amount of the local taxes is determined in various ways. In some cases they are fixed by the legislature or under its direction and in other cases they are determined by local boards, which exercise a *quasi*-legislative authority. (*Bixler* v. *Board of Supervisors,* 59 Cal. 698.)

The courts are very generally agreed that the authority to require the property specially benefited to bear the expense of local improvements is a branch of the taxing power or included within it. (*French* v. *Barber Asphalt Paving Co.,* 181 U. S. 324, [45 L. Ed. 879, 21 Sup. Ct. Rep. 625].)

"A tax is an enforced contribution for the payment of public expenses. It is laid by some rule of apportionment

according to which the persons or property taxed share the public burden, and whether taxation operates upon all within the state, or upon those of a given class or locality, its essential nature is the same." (*Houck* v. *Little River Drainage District*, 239 U. S. 266, [60 L. Ed. 266, 36 Sup. Ct. Rep. 58].)

These assessment charges are based upon the benefit which accrues to the property by reason of the improvement, and, therefore, the liability therefor persists against the property until some suitable legislation is enacted which will enable the governmental agency to enforce the same. (Page and Jones on Taxation by Assessment, sec. 958.)

Hence, if an illegal tax is voluntarily paid, no recovery in the absence of statutory authority will be permitted. (*Justice* v. *Robinson*, 142 Cal. 199, [75 Pac. 776].)

The method of levying taxes is a question of legislative policy, and there exists no contract between the taxpayer and the legislature that the same policy will be continued and that the method of levying taxes will not be changed. (*Bailey* v. *Maguire*, 22 Wall. 215, [22 L. Ed. 850].)

Herein, the legislature, in amending section 3466½, changed the policy of levying reassessments in reclamation districts, and this did not, for the reasons heretofore stated, deprive appellants or their predecessors in interest of any contractual right. The case, relating as it does to the method of taxation for the promotion of a governmental purpose, does not involve section 10 of article I of the constitution of the United States or section 16, article I, of our state constitution, which plaintiffs claim would be violated if section 3466½, as amended, is to be applied to the situation.

Of course, it cannot be said that the law "impairs the obligation of a contract" if there was no contract between the state and the owners of the land.

The broad ground upon which the United States supreme court declares the authority of the legislature to change the law rests is that the law-making power "is not making promises, but framing a scheme of public revenue and public improvement," and where it announces its policy by the enactment of a statute, "it may open a chance for benefit to those who comply with its conditions, but it does not address them and therefore makes no promise to them. It simply indicates a course of conduct to be pursued until circumstances or its

views of policy change. It would be quite intolerable if parties not expressly addressed were to be allowed to set up a contract on the strength of their interest in, and action on, the faith of a statute, merely because their interest was obvious and their action likely, on the face of the law." (*Wisconsin* v. *Powers,* 191 U. S. 379, [48 L. Ed. 229, 24 Sup. Ct. Rep. 107].)

Moreover, assuming that a question of vested interest might arise under the application of said sections of the code, still this case must fail, since it was a mere expectant or contingent interest at the time of the amendment of the statute. Such rights are contingent when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting. (*Pearsall* v. *Great Northern Ry.,* 161 U. S. 673, [40 L. Ed. 838, 16 Sup. Ct. Rep. 705].)

The section prior to said amendment provided that before credit should be given three circumstances must exist; first, an invalid assessment; second, payment before judgment of invalidity, and third, judgment of invalidity. The invalid assessment was paid in 1909; the amended statute became a law on April 5, 1911, but the judgment of invalidity was not entered until May 11, 1911, or after the repeal of the statute providing for the credit. The interest was not vested, therefore, and it ceased with the repeal of the statute. (*Anderson* v. *Wilkins,* 142 N. C. 154, [9 L. R. A. (N. S.) 1145, 55 S. E. 272].)

The right to credit for such payment is purely statutory. Hence, being *in fieri* at the time of the repeal of the statute, it ceased with such change in the law. The subject is thoroughly discussed in *Moss* v. *Smith,* 171 Cal. 777, 788, [155 Pac. 90], and we think the principle set forth therein is applicable to the present situation.

We conclude that in any event appellants have shown no injury or prejudice, and, besides, no reason exists for holding that the state entered into a contract with them, binding itself to give them credit for such payment, and, finally, that if the statute did create a right or interest that under certain contingencies could not be destroyed by subsequent legislation, such right or privilege being purely statutory and not being vested, fell with the law that gave it birth.

Other considerations might be suggested for an affirmance of the judgment, but we think the foregoing sufficient, and the judgment is affirmed.

Chipman, P. J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 26, 1918.